CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 26 2013

JULIA C. DUDLEY, CLERK
BY: KB
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | | |
|---|---|---|
| THOMAS L. GOODMAN, #1008318 | ) | CASE NO. 7:12CV00186 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| vs. | ) | |
| | ) | |
| MAJOR K. MCCOY, et al., | ) | By: James C. Turk |
| | ) | Senior United States District Judge |
| Defendants. | ) | |

Thomas L. Goodman, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment rights were violated by prison guards and officials at Red Onion State Prison. The Court dismissed some of Goodman's claims and some defendants in a Memorandum Opinion entered on July 13, 2012, ECF No. 13, leaving in the case two Eighth Amendment claims and three defendants—Defendants Looney, McCoy, and Stanley. Both remaining claims arise from two incidents on August 10, 2011, one following closely after the other.

First, Goodman alleges that Defendant Corrections Officer Looney yanked his arm through the tray slot in his cell door without provocation, causing injury to his arm. Second, he claims that Defendant Major K. McCoy made the decision to place Goodman in ambulatory restraints for 27 hours without bathroom breaks, causing him to defecate and urinate on himself. Defendant Lieutenant Stanley was the individual who supervised Goodman's placement in the restraints and, according to Goodman, purposefully placed a security smock on backward so that Goodman was prevented from using the toilet throughout the period of his restraint. Goodman's

Complaint seeks a temporary restraining order against Defendants,[1] a permanent transfer from the region in which he is currently housed, and $50,000 in damages. ECF No. 1 at 1.

Pending before the Court is Defendants' Motion for Summary Judgment, ECF No. 22, to which Goodman has responded, ECF No. 26. Although Defendants could have filed a reply, they did not.

Additionally, on February 6, 2013, the Clerk received from Goodman two motions, also pending before the Court and addressed herein. In the first, titled a "Motion in Limine," ECF No. 31, Goodman seeks to "have [his] institution file excluded from this case." Id. at 1. He does not further explain what he is seeking or what basis there is for exclusion. Thus, it is not clear to the Court whether he is trying to bar the Court from reviewing the file (which has not been provided to the Court in any event) for purposes of summary judgment, or he seeks to exclude it from being introduced at any trial in this case. In the second motion, docketed as a "Motion for Settlement Hearing," ECF No. 32, Goodman requests that the Court order a settlement hearing, and sets forth his "statement" as to what he would accept in settlement of his claims.

Upon review of the record, the Court finds that Defendants' motion should be **GRANTED**. Goodman's motions are therefore **DENIED AS MOOT**.

I.  FACTUAL BACKGROUND

A.  Excessive Force Claim Against Officer Looney

The parties present different versions as to what occurred between Goodman and Defendant Looney on August 10, 2011, although they agree on some facts. It appears undisputed that on that date, Looney and Corrections Officer W. Ingle were placing a handcuffed Goodman into his cell.

---

[1] The request for a temporary restraining order previously was denied by the Court. See ECF No. 14.

2

Goodman avers that, as he was being escorted to his cell, other inmates asked him why he was "getting locked up." When he responded that Corrections Officers Brock and Looney were setting him up on a "bogus charge" and that he would be back out, Officer Looney allegedly said, "Oh no you won't nigger." Goodman responded, "You ain't talking about shit . . . This shit ain't going to work."

According to Goodman, after he was placed in his cell and his left handcuff was removed, he voluntarily placed his left arm on his head, since that is sometimes requested by guards. Then Officer Looney allegedly "yanked [his] right cuffed arm through the tray slot stating, [']you remember this nigger' as she twisted [and] pulled on [his] arm." ECF No. 26 at 2. Goodman alleges this caused injuries to his arm, wrist, and shoulder.

Although Defendants do not provide any sworn statement from any witness to the events at the cell, their filings with the Court tell a different version of events. They claim that after Goodman's left handcuff was removed, it was Goodman who pulled his right arm into his cell, causing Officer Looney to strike her hand and forearm on the latch of the tray slot. Officer Ingle apparently was able to maintain control of the lanyard strap. Neither Goodman nor Defendants specify whether Goodman was re-handcuffed at that time or not.

### B. Facts Underlying Goodman's Eighth Amendment Claim Based on Use of Ambulatory Restraints

After the incident at his cell, Goodman claims he was improperly restrained in ambulatory restraints for an excessive period of time, without being permitted to use the bathroom, and that this was cruel and unusual punishment. He appears to be arguing both that: (1) there was no basis for placing him in the cell because he did not create a disturbance; and (2) the restraints, combined with Defendant Stanley's actions in purposefully putting on Goodman's

3

security gown backward and the denial of bathroom breaks, prevented him from being able to use the bathroom for the twenty-seven-hour period he was in restraints.

Defendants allege that, immediately following the incident at Goodman's cell with Defendant Looney, Defendant Stanley was called to the pod and informed as to what had happened. According to Stanley, he ordered that Goodman be escorted to the A-1,2,3 vestibule. Once there, Goodman was strip searched and placed into a smock and ambulatory restraints per the direction of Defendant McCoy. Stanley and two other corrections officers placed Goodman into the ambulatory restraints, and the nurse checked the restraints and determined that they were applied correctly. The nurse also asked Goodman if he had any injuries, at which time he stated his arm got caught in the tray slot. The nurse noted a small area of abrasion of Goodman's inner right forearm, but no bleeding. Goodman was then taken into cell A-204 without further incident. It is apparently undisputed that the cell had a toilet in it.

The parties agree generally on the length of time Goodman was in the ambulatory restraints and in cell A-204,[2] but disagree as to how restrictive the circumstances of his restraint were.[3] According to Defendants,

---

[2] Goodman alleges it was twenty-seven hours; Defendants contend it was twenty-six. This one hour difference is not legally significant, but the Court will construe the facts in the light most favorable to Goodman, as it must, and credit Goodman's averment that it was twenty-seven hours.

[3] None of the parties describe the smock or the restraints in any detail. Another judge of this Court, however, has described ambulatory restraints as follows:
> [a] inmate in ambulatory restraints has his hands cuffed in front, double locked, with a black box covering the center keyhole portion of the cuffs. He also wears leg irons, with a security waist chain running through the black box on the handcuffs and down to the leg irons.

Holley v. Johnson, No. 7:08-cv-629, 2010 WL 2640328, at *10 (W.D. Va. 2010). The Fourth Circuit has recognized differences between ambulatory restraints, on the one hand, and four and five-point restraints, on the other. In the latter, an inmate's hands and legs are apparently strapped to a bed, either with a chest strap (five-point) or without (four-point). See, e.g., Jackson v. Morgan, 19 F. App'x 97, 102-03 (4th Cir. 2001) (unpublished) (explaining that while "four-point mechanical restraints" at issue in Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996), prevented the prisoner from eating, required him to urinate on himself, and did not allow him to wash mace off his face; three-point restraints restricted movement, but did not totally prevent a prisoner from either eating or from being able to remove his underwear).

4

> Goodman was placed in ambulatory restraints on August 10, 2011 at 1:02 p.m. and was removed from ambulatory restraints at 3:00 p.m. on August 11, 2011 when his disruptive behavior subsided. During that time, there was a toilet in Goodman's cell. Ambulatory restraints do not restrict the offender from using the restroom. Additionally, Goodman's cell was checked per procedure while he was in ambulatory restraints. Procedure requires observation at fifteen minute intervals and the shift commander is responsible for observation of the offender at least twice during a shift to determine if restraining is still necessary.

ECF No. 23-2, Stanley Aff. ¶ 6.

In his response to the summary judgment motion, Goodman avers that after he was strip-searched, he was placed in a "blue security smock" and that the gown was intentionally and purposefully placed on him backward. ECF No. 26 at 3. He complained while it was being put on him because it was backwards or "wrong," and Defendant Stanley allegedly told him, "This is how it's going on." Id. Goodman also avers that, once in his cell, Defendant Stanley told another guard to "leave it on like that so [Goodman] can't open it and leave it on till tomorrow." Id. Goodman further explains: "If the smock had been applied properly I could've open[ed] the velcro strap and accessed the toilet but due to it intentionally being placed on me backward, I was effectively restricted" from accessing the toilet. Id. at 4.

Goodman also contends that, while in his cell, he repeatedly asked for a restroom break, but his pleas were ignored by Defendant Phipps, who has been dismissed from the suit. He eventually urinated on himself and showed Defendant Phipps, but "nothing was done." Id. He later defecated on himself after he could not "wait any longer." Id.[4] In his Complaint, Goodman alleges that leaving him in the restraints for such a lengthy amount of time without allowing him

---

[4] Goodman does not specify at what time he urinated or defecated, how long there was in between those two events, or how long he remained in restraints after those events. Defendants have not provided any such information, either, and no reference to those events appears in Goodman's medical records.

5

to use the restroom constituted cruel and unusual punishment, in violation of his Eight Amendment rights. Notably, he does not allege that the restraints themselves caused him pain, or that the period of restraint otherwise resulted in any injuries to him.

Goodman's medical records reflect that, while Goodman was in the restraints, a nurse noted that his hands were "slightly swollen" and he was advised to move his hands and fingers. ECF No. 26-1 at 5. Five days later, on August 16, 2011, Goodman was seen by medical personnel again. The medical records are not entirely legible and thus difficult to read, but the notes appear to reference Goodman complaining of both right shoulder and right arm pain and reporting that his "right arm was pulled and twisted last Wednesday." Id. Additionally, an x-ray of his right shoulder was ordered at that time. Id. It appears, based on Goodman's own statements to medical personnel, that these injuries are related to the altercation at the cell with Defendant Looney and not to the use of the restraints.

## II. ANALYSIS

In their summary judgment motion, Defendants raise three discrete arguments. First, they contend that Plaintiff's excessive force claim against Defendant Looney should be dismissed because Goodman failed to exhaust his administrative remedies. Second, they argue that the undisputed facts as alleged by Goodman do not establish an Eighth Amendment violation. Third, and finally, they contend that they are entitled to qualified immunity insofar as damages are sought against them, and that there is no basis for awarding injunctive relief here. The court will briefly set forth the summary judgment standard, and then address Defendants' arguments.

### A. Summary Judgment Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of

material fact exists when a rational trier of fact, considering the evidence in the record as a whole, could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009). "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)). Put differently, summary judgment should be entered if the Court finds, after a review of the record as a whole, that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

To defeat a supported motion for summary judgment, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (citation and internal quotation omitted).

### B. Whether Goodman Failed to Exhaust His Excessive Force Claim Against Defendant Looney

#### 1. Exhaustion Requirements

As noted, Defendants' first argument is that Goodman failed to exhaust his administrative remedies with regard to the excessive force claim against Officer Looney. The Prison Litigation Reform Act ("PLRA"), among other things, provides in 42 U.S.C. § 1997e(a) that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. Nussle v. Porter, 534 U.S. 516, 524 (2002). This exhaustion requirement applies to "all inmate suits, whether they involve general circumstances or particular

7

episodes, . . . whether they allege excessive force or some other wrong," and whether the form of relief the inmate seeks is available under the administrative procedure. Id. "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007). To comply with § 1997e(a), an inmate must follow each step of the established administrative procedure that the facility provides to prisoners and meet all deadlines within that procedure before filing his § 1983 action. See Woodford v. Ngo, 548 U.S. 81, 90-94 (2006). The defendants bear the burden of proving the affirmative defense that Goodman failed to exhaust available administrative remedies regarding his claims. Jones, 549 U.S. at 212.

Operating Procedure 866.1 sets out the administrative procedure inmates in Virginia Department of Corrections (VDOC) prisons must follow to resolve grievances. An inmate must first make a good faith effort to informally resolve his grievance about an incident by submitting an informal complaint. If dissatisfied with the response to his informal complaint, the inmate may then file a regular grievance within 30 days of the incident, with the informal complaint and response attached. See ECF No. 23-1, Mullins Aff. at ¶¶ 4, 7 & Ex. A.

OP 866.1 provides three levels of review for regular grievances. The Warden or Superintendent of the facility conducts Level I reviews and must respond to the regular grievance within 30 days. When the Level I review paperwork is returned to the inmate, it includes the title and address where the inmate may forward his appeal if he is dissatisfied with the Level I response. The Regional Director provides Level II review of grievances not related to medical care or time computation, and Level II is the final level of review. Id. ¶ 8 & Ex. A. Certain issues are also appealable to Level III, where the review is conducted by the Deputy Director or Director of the VDOC. Id.

### 2. Plaintiff's Grievances as to the August 10, 2011 Incident Involving Defendant Looney

Both Goodman and Defendants have submitted copies of pertinent grievance forms in this case. Those records reflect that Goodman initially submitted a timely informal complaint, on August 25, 2011, alleging that Officer Looney assaulted him on August 10, 2011, by yanking his arm and shoulder through the tray slot in his cell. The Investigator responded on September 9, 2011, stating that the video surveillance showed there was a struggle at his cell and that Looney stated (and another officer witnessed) Plaintiff pulling away, causing Looney to scrape her hand on the tray slot.[5] Based on that investigation, the informal complaint was denied. See ECF No. 23-1, Mullins Aff. at ¶ 9-10 & Ex. B.

On a form dated September 14, 2011, in an apparent attempt to continue with the grievance process, Plaintiff then submitted a regular grievance alleging that Officer Looney assaulted him by yanking his arm through the tray slot in his cell, causing scrapes, cuts and bruises on his wrist. This grievance was rejected for intake because it stated that the date of the occurrence was September 9, 2011, but the informal complaint had referenced an incident occurring on August 10, 2011. The attached informal complaint, however, was the same complaint that Goodman had submitted referencing the August 10, 2011 incident. Thus, it appears evident that Goodman was attempting to continue his grievance of the August 10, 2011 incident and had simply included the incorrect date on the regular grievance form. Nonetheless, the intake coordinator rejected it with the explanation that "the issue in the grievance" was "different that the issue in the informal complaint," because of the difference in dates. Id. at ¶ 10 & Ex. B.

---

[5] No video recording has been provided to the Court, and none of the parties reference the video as material to determination of the issues on summary judgment.

9

Defendants contend that Goodman's failure to include the correct date of the incident in his regular grievance means that he failed to exhaust his remedies. Alternatively, they argue that the regular grievance was not timely, even if it had properly related to the informal grievance.[6] The Court need not address Defendants' first ground for arguing a failure to exhaust because it finds the second persuasive. That is, Plaintiff was required to submit his regular grievance no later than September 10, 2011, which was thirty days after the August 10, 2011 incident. Even crediting as accurate the date Goodman wrote on the grievance,[7] which was September 14, 2011, that is more than thirty days after the incident and thus, is not a timely-submitted grievance. Accordingly, the Court concludes that Goodman has failed to properly exhaust his claim against Defendant Looney and that claim is therefore **DISMISSED,** under § 1997e(a).

### C. Claim Regarding Ambulatory Restraints

#### 1. Eighth Amendment Standard and Excessive Force Claims

Goodman couches his claim regarding the ambulatory restraints as a claim under the Eighth Amendment to the United States Constitution, which prohibits "cruel and unusual punishments." U.S. Const., Amend. VIII. He does not specify whether he is asserting a conditions of confinement claim or an excessive force claim, but it appears to the Court that his specific allegations fit more easily into the latter category and so the Court treats it as an excessive force claim.[8] It is well established that "the unnecessary and wanton infliction of pain .

---

[6] Defendants further posit that Goodman failed to appeal this intake decision, but he has submitted forms indicating that he asked for a review of the intake decision from the Regional Ombudsman, who upheld the intake decision on October 4, 2011. See ECF No. 26-1 at 1-4.

[7] Defendants contend that the grievance was not submitted or received until September 16, 2011. ECF No. 23-1, Mullins Aff. at ¶ 10. For purposes of ruling on the summary judgment motion, the Court treats September 14, 2011 as the submission date.

[8] The claim could also be viewed through the lens of a conditions of confinement claim. See, e.g., Holley v. Johnson, Case No. 7:08CV00629, 2010 WL 2640328, at *12-13 (W.D. Va. June 30, 2010), as Defendants seem to do. See ECF No. 23 at 5. The analysis of the claim as a conditions claim would differ slightly, i.e., Goodman would have to establish that Defendants acted with subjective deliberate

. . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). Claims under the Eighth Amendment have two components, both of which must be satisfied to entitle a prisoner to relief: (1) an objective component, which asks whether a prison official's alleged wrongdoing was "objectively harmful" enough to establish a constitutional violation, and (2) a subjective component, which asks whether the official "act[ed] with a sufficiently culpable state of mind." Id. at 8 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The showing required for each of these components varies with the context in which the plaintiff's claim arises. Id.

The objective component of an excessive force claim "can be met by the pain itself, even if an inmate has no enduring injury." Williams v. Benjamin, 77 F.3d 756, 762 (4th Cir. 1996) (omitting internal quotations). On the other hand, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (omitting citations). The Eighth Amendment thus does not prohibit all applications of force that inflict pain against prisoners. United States. v. Gore, 592 F.3d 489, 494 (4th Cir. 2010). Moreover, prison administrators are entitled to broad deference in determining what policies and practices are necessary to preserve or restore security and order. Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998).

The subjective component of an excessive force claim asks whether officials, subjectively, applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson, 503 U.S. at 7-8 (omitting

---

indifference to a substantial risk of a "serious or significant physical or emotional injury." See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). The Court concludes that the result of the claim, however, would be the same. That is, even assuming Goodman could establish a constitutional violation, Defendants would nonetheless be entitled to qualified immunity.

11

internal quotations). In Whitley, the Supreme Court recognized that relevant factors to consider in making the subjective inquiry are: (1) the need for application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury, (4) the threat reasonably perceived by the responsible officials based on the facts known to them, and (5) any efforts made to temper the severity of a forceful response. 475 U.S. at 321.

In short, the "core judicial inquiry [is] . . . the nature of the force—specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 130 S. Ct. 1175, 1179 (2010) (citation and internal quotation marks omitted). The extent of the injury the inmate suffered is relevant to both of these determinations: as a factor in determining "whether use of force could plausibly have been thought necessary in a particular situation" and as "some indication of the amount of force applied." Id. at 1178. If the court cannot find that "the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under this two-part standard," the defendants are entitled to summary judgment on the issue of excessive force. Whitley, 475 U.S. at 322.

### 2. Qualified Immunity

Defendants argue that, in applying those principles here, the Court should conclude both that Goodman cannot satisfy either the objective or subjective component of his Eight Amendment claim and that dismissal is warranted on that ground. They also contend that they are entitled to qualified immunity. Because qualified immunity requires a determination of whether a constitutional right has been violated, these arguments are interrelated, and the Court turns first to qualified immunity.

12

Case 7:12-cv-00186-JCT   Document 33   Filed 02/26/13   Page 12 of 20   Pageid#: 160

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The doctrine is intended to ensure that officers are held personally liable only for "transgressing bright lines" and not for "bad guesses in gray areas." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992); see also Braun v. Maynard, 652 F.3d 557, 560 (4th Cir. 2011) (quoting same and discussing basic principles of qualified immunity). Thus, a government official performing a discretionary function is generally entitled to qualified immunity to the extent that his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The Supreme Court has further specified that "the contours of the right [at issue] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 638 (1986). The purpose of the "clearly established" requirement is providing notice to potential defendants: "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his *conduct* was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001) (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)).

Qualified immunity involves a two-step inquiry that asks "first whether a constitutional violation occurred and second whether the right was clearly established." Henry, 652 F.3d at 531 (citations omitted). The Supreme Court has also clarified that courts have the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236-37 (2009).

In this case, as explained more fully below, the Court believes it is appropriate to exercise the discretion discussed in Pearson. Thus, although the Court discusses the issue to provide further explanation, it will only assume, but does not decide, that Goodman has set forth sufficient facts from which a jury could conclude that a constitutional violation has occurred. It nonetheless concludes that Defendants McCoy and Stanley are entitled to qualified immunity, because the constitutional right allegedly violated was not clearly established.

### a. Whether A Constitutional Violation Has Occurred

In determining whether a constitutional violation has occurred, the Court first notes the ample authority (much of it from the Western District of Virginia) holding that the use of ambulatory restraints for extended periods of time does not generally constitute an Eighth Amendment violation because such use does not satisfy the objective component of the excessive force inquiry. See Holley v. Johnson, Case No. 7:08CV00629, 2010 WL 2640328, at *14 n.22 (W.D. Va. June 30, 2010) ("This court has repeatedly held that the extended use of ambulatory restraints which does not result in significant physical injury . . . does not satisfy the objective component of an Eighth Amendment excessive force claim[,]" and collecting authority); see also Madison v. Kilbourne, No. 7:04-cv-639, 2006 WL 2037572 (W.D. Va. July 18, 2006), aff'd in relevant part, 228 F. App'x 293 (4th Cir. Mar. 27, 2007) (being held in ambulatory restraints for fourteen hours did not violate Eighth Amendment). Indeed, this Court recently held that being restrained in ambulatory restraints for a period of sixteen hours in a cell without access to a toilet did not satisfy the objective component of an Eighth Amendment excessive force claim. See Hill v. O'Brien, 2011 WL 1238038 (W.D. Va. Apr. 4, 2011).[9]

---

[9] The Hill case went to trial on other claims in the case and is currently on appeal and scheduled to be argued before the United States Court of Appeals for the Fourth Circuit. See generally docket in Hill v. Crum, No. 12-6705 (4th Cir.) (reflecting case is calendared for oral argument on March 22, 2013).

14

In addressing whether the extended use of ambulatory restraints gives rise to an excessive force claim, the Holley court explained:

> In response to an inmate's admittedly disruptive misconduct, a temporary limitation of an inmate's access to hygiene products, bedding, eating utensils, and freedom of movement, which causes the inmate no physical injury other than temporary discomfort and embarrassment, simply cannot qualify as a use of force that is "repugnant to the conscience of mankind."

Holley, 2010 WL 2640328, at *14 (granting summary judgment for defendants on excessive force claim where inmate was maintained in ambulatory restraints for 48 hours). As the Holley court reasoned, ambulatory restraints, as a control mechanism, properly applied and maintained even for a lengthy period, are "not a use of force that offends contemporary standards of decency so as to satisfy the objective component of an excessive force claim." Id.

The inquiry in this case, however, is slightly different, due to Goodman's allegations regarding the security smock. That is, the Court must inquire whether the use of ambulatory restraints for an extended period of time, coupled with officials taking steps to prevent an inmate from being able to relieve himself in a toilet (which naturally results in an inmate urinating and defecating on himself), qualifies as force that is "repugnant to the conscience of mankind" or "offends contemporary standards of decency."[10] In particular, Defendants have wholly failed to respond to Goodman's testimony that Defendant Stanley purposefully ordered that the security smock be placed backward on Goodman in order to prevent him from using the toilet in the cell. They have provided no video evidence to show that Goodman could have properly used the toilet in the cell and no evidence regarding how the smock was placed on him. If Goodman is to be

---

[10] As noted, Goodman has not alleged pain or other injury as a result of being restrained, other than slight swelling. Although he later sought medical treatment for his injured arm and shoulder, he attributed those injuries to the earlier altercation with Defendant Looney.

15

believed, then, Defendant Stanley's actions placed him in such a position that he would be virtually certain to urinate and/or defecate on himself over a period of 27 hours.[11]

In this respect, this case differs from cases like Holley and most of the others the Court has found, in which there were typically either bathroom facilities available or the inmate was given regular bathroom breaks. See Holley, 2010 WL 2640328, at *13 (noting that the restraints did not prevent Holley from "deposit[ing] his bodily waste in a toilet"); id. at *15 n.23 (finding this fact significant in distinguishing the case before it from other cases). Moreover, in analyzing the plaintiff's time in restraints as a conditions of confinement claim, the Holley court distinguished the case before it from Hope v. Pelzer, 536 U.S. 730 (2002), in part, by noting that "the emotional effect of not being able to wipe himself, direct his urine, or eat with utensils does not compare with the level of humiliation at issue in Hope, where the inmate had no independent access to a toilet." The facts as alleged here, at least as to the issue of toilet access, are more akin to Hope.[12] In short, it is a close call whether under the particular facts alleged here—facts largely undisputed due to a lack of a meaningful response by Defendants—a jury could find Defendants' acts "offend contemporary standards of decency," thus satisfying the objective component.

Similarly, the Court concludes it is also a difficult question as to whether Goodman can establish the subjective component of his claim. Notably, there is no affidavit by anyone with

---

[11] While the Court understands how a flap in the front of a gown could make it easier for a handcuffed prisoner to urinate in a toilet, it is not clear to the Court what difference the gown placement would have made in terms of Goodman accessing the toilet for a bowel movement. That is, either he could lift his gown while restrained or he could not. If he could, then he should have been able to access and properly use the toilet regardless of how the gown was positioned on him. In any event, and noting again the failure of Defendants to respond to the allegation regarding the gown at all, the Court concludes there is at least a dispute of fact as to whether the gown and its placement prevented Goodman from properly using the toilet at all.

[12] The overall facts in Hope, however, differ significantly from the facts of the case at bar. As described by the Holley court, the Supreme Court in Hope found that an "inmate's allegations of being handcuffed to [a] hitching post in [the] hot sun for seven hours in [an] awkward position with limited access to bathroom facilities and drinking water, as punishment after being disruptive during a work detail, satisfied [the] subjective and objective elements of Eighth Amendment conditions claim." Holley, 2010 WL 2640328, at *12.

16

personal knowledge disputing Goodman's testimony that he was not disruptive either before or while in the restraints, nor any videotape of the alleged events. Instead, there is only a single affidavit regarding Goodman's disruptive behavior. That affidavit is from Defendant Stanley, who was not even present at the time of the apparent disruption that necessitated the restraints.

Noticeably absent from his affidavit, moreover, are any facts or description of Goodman's behavior while in the restraints or any contemporaneous record or report referencing his observed behavior while in the restraints.[13] Thus, while Defendant Stanley offers the vague and conclusory statement that Goodman was kept in restraints until 3:00 p.m. the following day "when his disruptive behavior subsided," ECF No. 23-2, Stanley Aff. at ¶ 6, there is nothing to indicate why that took 27 hours or what Goodman was continuing to do while restrained that was "disruptive." Indeed, the only references in Defendant Stanley's affidavit to Goodman's behavior after he was placed in restraints suggest that he was compliant and not disruptive: "Goodman was . . . escorted and placed into cell A-204 without further incident. There were no injuries to myself or staff with the exception of Officer Looney." Id. at ¶ 5. In short, there is disputed evidence as to whether Goodman was ever disruptive, and no facts before the Court to support any claim that he was disruptive once in restraints, such that he needed to be kept in the restraints for 27 hours.[14]

Defendants also have wholly failed to respond to Goodman's averments regarding the placement of the security smock. Thus, a jury could credit Goodman's testimony that he did nothing to warrant being put in restraints, that he did nothing to warrant being kept in restraints

---

[13] The affidavit states that Goodman's cell was "checked per procedure," which "requires observation at fifteen minute intervals and the shift commander is responsible for observation of the offender at least twice during a shirt to determine if restraining is still necessary." ECF No. 23-2, Stanley Aff. at ¶ 6.

[14] This is another way in which this case is distinguishable from both Hill and Holley, where it was undisputed that the prisoner plaintiff had engaged in disruptive behavior warranting the use of restraints to begin with.

for 27 hours, and that he was purposefully prevented from accessing a toilet for 27 hours, solely as a wanton act of punishment. Under the relevant Whitley factors, then, the Court concludes there is at least a colorable argument that a jury could conclude that the subjective component is satisfied.[15]

For all of these reasons, the Court will assume, without deciding, that Goodman has adequately presented facts sufficient to establish an Eighth Amendment violation. Nonetheless, Defendants argue—and the Court agrees—that they are entitled to qualified immunity because the right here was not clearly established.

### b. Whether the Right Violated by Defendants' Conduct Was Clearly Established

The Fourth Circuit has explained that a right is clearly established where "the contours of the right... have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." Edwards v. City of Goldsboro, 189 F.3d 231, 251 (4th Cir. 1999) (internal quotation marks and citation omitted). The Court easily concludes that standard is not met here. As is evident from the Court's discussion above as to whether there even has been a violation, virtually all the cases that Defendants could have consulted at the time of this incident, have held that the use of ambulatory restraints (as opposed to more restrictive types of restraints), even for lengthy periods, did not offend the Eighth Amendment. At least some of those, including one from this Court, have concluded that even though a prisoner had no access to a toilet during the

---

[15] In addressing the "subjective inquiry," it is worth noting that it is the reasonable perception of the officials responsible for ordering the detention that is relevant. See Whitley, 475 U.S. at 321 (one factor is the extent of the threat "as reasonably perceived by the responsible officials on the basis of the facts known to them"). Thus, although Goodman stresses that he was not being disruptive and did nothing to warrant being restrained, Defendants Stanley and McCoy had reports from two of their corrections officers to the contrary. Indeed, based on what Defendants Stanley and McCoy were being told and reasonably believed, Goodman had purposefully injured a staff member. Additionally, even if Goodman's version of events is credited, he admits to disagreeing verbally with Defendant Looney prior to being placed in his cell. Thus, there is some evidence in the record to support Defendant Stanley's assertion that Goodman was being disruptive and that restraints were a reasonable response to prevent further injury.

18

time he was in ambulatory restraints, no Eighth amendment violation occurred. See Hill, supra. In a similar case addressed by the Fourth Circuit, that court concluded that defendants were entitled to motion for judgment as a matter of law on plaintiff's excessive force claim, where the prisoner plaintiff was repeatedly sprayed with pepper spray and then held in three-point restraints for two days. See, e.g., Jackson v. Morgan, 19 F. App'x 97, 9 (4th Cir. Sept. 24, 2001) (unpublished). Notably, moreover, the isolation cell where the plaintiff in Jackson was held had no toilet—only a hole in the floor covered by a feces- and blood-encrusted grate—and according to the dissenting opinion, the plaintiff was unable to use his hands to assist in urination. Id. at 105, 109. The Fourth Circuit has also reasoned that inmates who were held for six months in cells that were hot, flooded with water from a leak in the toilet on a floor above, infested with vermin, and smeared with urine and feces, did not state an Eighth Amendment claim based on the conditions of their confinement. See Beverati v. Smith, 120 F.3d 500, 504, 505 & n.5 (4th Cir. 1997). These cases, too, certainly would not have told Defendants that their alleged conduct in this case was clearly unconstitutional.

Indeed, Goodman has not pointed to a case in which the use of ambulatory restraints coupled with preventing or limiting access to a toilet for any period of time was held to violate the Eighth Amendment, where there were no other aggravating factors or injuries.[16] Given this dearth of case law, the Court easily concludes that Defendants' alleged conduct here did not violate a "clearly established right." Instead, the Court concludes that no "bright line" existed that would have told Defendants Stanley and McCoy that their conduct was unconstitutional, assuming it was. See Maciariello, 973 F.2d at 298 (qualified immunity will not shield officers who transgress "bright lines," but does protect against "bad guesses in gray areas.").

---

[16] While Goodman is pro se and thus held to a more lenient standard in terms of his filings, the Court's own research has not found such a case, either.

19

Accordingly, both Defendants are entitled to qualified immunity and their motion for summary judgment is GRANTED on that ground as to Goodman's claims against them for monetary relief.

### 3. Claim for Injunctive Relief

Finally, to the extent Goodman is seeking injunctive relief, the Court concludes that he is not entitled to it. Even assuming he could state a claim for an Eighth Amendment violation and the jury would find in his favor, injunctive relief would not be warranted here. In particular, he has not shown the likelihood of the recurrence of the events as alleged in this lawsuit. See City of Los Angeles v. Lyons, 461 U.S. 95 (1983) (a man who claimed that Los Angeles police had placed him in a chokehold lacked standing to pursue injunctive relief against future chokeholds absent a real and immediate threat of again being choked); Bryant v. Cheney, 924 F.2d 525, 529 (4th Cir. 1991) (discussing same). Nor has he demonstrated that the remedies available at law are inadequate or that he has suffered an irreparable injury so as to warrant a permanent injunction. See, e.g., Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) (setting forth permanent injunction standard). Thus, his claims for injunctive relief are also dismissed as without merit.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 23, is **GRANTED**. Goodman's remaining motions, ECF Nos. 31, 32 are **DENIED AS MOOT**.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to Plaintiff and counsel for Defendants.

ENTER: This 26th day of February, 2013.

James C. Turk
Senior United States District Judge